

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AHMAD MILAM, et al., | ) |
| Plaintiffs, | ) No. 03 C 9343 |
| vs. | ) Judge Joan H. Lefkow |
| DOMINICK'S FINER FOODS, INC., et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Ahmad Milam ("Milam"), Travis Thomas ("Thomas"), Timothy Smith ("Smith"), Charles Hamb, Jr. ("Hamb"), Marlon Clark ("Clark"), and Stephen Falkner ("Falkner") (collectively, "Plaintiffs"),[1] filed suit against Dominick's Finer Foods, Inc. ("Dominick's") and Robert Smith, Thomas Odette ("Odette"), and Mark Selby ("Selby") (collectively, "the Dominick's Defendants"), as well as United Food and Commercial Workers Union, Local 881 ("the Union"), and Patrick Statter ("Statter") (together, "the Union Defendants"). In Count I, Plaintiffs allege that all defendants discriminated against them on the basis of race in violation of 42 U.S.C. § 1981(A). Count II alleges that the Dominick's Defendants intentionally discriminated against them on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"). In Counts III and IV, respectively, Plaintiffs Clark, Falkner, and Hamb allege that the Dominick's Defendants intentionally discriminated against them on the basis of race and that all defendants intentionally

---

[1] Plaintiff Mycayale Ragland was dismissed from the lawsuit on August 16, 2005 after failing to appear for a scheduled deposition. *See* Dkt. No. 68.

discriminated against them on the basis of sex, both in violation of Title VII. Count V alleges that the Union breached its federal common law duty of fair representation, while Count VI alleges that all defendants violated Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Presently before the court are the Dominick's Defendants' and the Union Defendants' separate motions for summary judgment. For the reasons stated below, the motions are denied in part and granted in part.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©. To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(C) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as draw all reasonable inferences

2

in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## BACKGROUND FACTS[2]

### A. Plaintiffs' Employment with Dominick's

Dominick's is a large grocery store chain operating in the Chicago area. Plaintiffs, all African-American males, have been continuously employed by Dominick's and members of the Union since at least the inception of the collective bargaining agreement entered into between Dominick's and Union in 1999 ("the CBA"). Between January 2001 and December 2002, the relevant time period in this case, Plaintiffs were continuously members of the union and employed as part-time Produce Clerks in the produce department at Dominick's Store 1147. During that time period, Robert Smith was the Produce Department Manager. O'Dette was Store

---

[2]These motions have a long and unfortunate history. Both motions were filed separately on July 24, 2006. Plaintiffs filed a response to the Union Defendants' motion on October 2, 2006, two weeks after the September 19, 2006 deadline. The next day, the Union Defendants moved to strike Plaintiffs' response, which the court denied on October 5, 2006, thereby excusing Plaintiffs' late filing. *See* Dkt. No. 144.

Plaintiffs failed to timely respond to the Dominick's Defendants' motion after receiving a third and final extension. As a sanction, the court initially entered judgment in favor of the Dominick's Defendants. *See* Dkt. No. 171. The court later vacated that Order, but nevertheless denied plaintiffs leave to file a belated response to the Dominick's Defendants' statement of material facts and memorandum, as well as their statement of additional material facts.

Fortunately for Plaintiffs, there is substantial overlap between the Union Defendants' and the Dominick's Defendants' motions for summary judgment. Because the court desires to have this case resolved on its merits, where possible, the court considers Plaintiffs' position as stated in its response to the Union Defendants' motion for summary judgment in evaluating the Dominick's Defendants' motion for summary judgment. Thus, in many respects, the court treats the defendants' motion as a single motion. Accordingly, the following statement of facts come from the defendants' Local Rule 56.1(a) statements of material facts and accompanying exhibits, as well as Plaintiffs 56.1(b) statements submitted in response to the Union Defendants' motion for summary judgment. As indicated, the court does not consider Plaintiffs' 56.1(b) statements of material facts submitted in response to the Dominick's Defendants' motion for summary judgment.

3

Manager until April 2001, when Selby assumed that role. Robert Smith, O'Dette, and Selby are all Caucasian males.

The terms and conditions of employment for the employees at Dominick's Store 1147 are governed by the CBA. The CBA classifies the employees into specific seniority groups and sets out the seniority terms of each group. The four seniority groups are, in rank order: 1) Classified employees; 2) Regular Clerks; 3) General Merchandise Clerks; Bakery Clerks; Floral Clerks; Salad Bar / Bulk Food Clerks; and 4) Utility Clerks. The "Regular Clerk" group is defined in the negative as all employees other than those in the other three seniority groups. Produce Clerks fall within the "Regular Clerks" seniority group.

To constitute a promotion under the CBA an employee must move to a seniority group with a higher wage scale. A promoted employee has two seniority dates: 1) the date of hire; and 2) the date of promotion. The promotion date is the applicable seniority date for the promotee within his new seniority group.

When a job opening occurs within a store, the vacancy must be posted for five days, Tuesday through Saturday, before the job can be filled. The job may be filled either by "an employee from the next lower seniority group within the store, based upon seniority, ability and availability," or by an employee desiring to make a lateral transfer between jobs within a seniority group.

Under the CBA, senior employees may work (or "claim") hours of less senior employees within his seniority group. Thus, senior Produce Clerks may claim the hours of less senior Produce Clerks. Employees may not claim hours of employees in different seniority groups.

4

## B. Kathy Villanueva

Sometime in January 2001, Kathy Villanueva ("Villanueva"), a Caucasian female, who was employed at Dominick's Store 1147 as a Salad Bar Clerk, spoke to the Produce Department's Manager, Robert Smith, about transferring into the position of Produce Clerk. Robert Smith completed an "Employee Date Form-I", changing Villanueva's job title from "Salad Bar" to "Produce". The following day, Villanueva advised Robert Smith that she was no longer interested in the position of Produce Clerk. Nevertheless, although Robert Smith did not submit the job classification form to the Dominick's Human Resource Department, someone did, as it was received by the Dominick's Employee Service Center on January 16, 2001. Shortly thereafter, Villanueva was formally reclassified as a Produce Clerk and began receiving Produce Clerk wages, which were higher than those she received as a Salad Bar Clerk. Under the terms of the CBA, Villanueva's reclassification constituted a promotion, because she was elevated into a higher seniority group with higher wages. The CBA posting procedures for promotions were not followed.

Under the CBA, Dominick's is required to post a weekly Produce Department schedule, generally prepared by the Produce Department Manager, which lists the weekly hours of Produce Department employees by seniority group and in order of seniority within each group. Following Villanueva's reclassification, she continued to be listed on the weekly work schedule as a Salad Bar Clerk. While on at least a few occasions Villanueva performed Produce Clerk duties in violation of the CBA, which prohibits employees of a lower seniority group from performing the duties of employees of a higher seniority group, she generally continued to perform the duties of Salad Bar Clerk.

5

In December 2002, Thomas somehow learned of Villanueva's formal classification as a Produce Clerk. On December 11, 2002, Thomas met with Statter, his Union Representative, to object to the fact that Villanueva was classified as Produce Clerk while being listed on the weekly work schedule and actually performing the duties of Salad Bar Clerk. Thomas told Statter that if he had known that Villanueva was classified as Produce Clerk, he, as a senior Produce Clerk, would have claimed her hours. Statter, in Thomas's presence, contacted Selby, the Store Manager, to inquire about Villanueva's classification. Selby advised Statter that Villanueva was a Salad Bar Clerk.[3]

On January 8, 2003, Statter filed a grievance regarding Villanueva's classification and job duties and commenced an investigation. In the course of his investigation, Statter spoke to Selby and Herm Ilag, a Dominick's Store Manager from 1995 to 1998 and Dominick's Human Resources Advisor from 1990 until November 2003. Selby and Ilag confirmed that Villanueva had been inadvertently reclassified as Produce Clerk, but told Statter that the paperwork had been submitted to revert her classification back to Salad Bar Clerk, and that Villanueva's pay rate would be reduced back to that of Salad Bar Clerk. Statter also spoke with other Dominick's employees. In particular, Statter spoke with other Salad Bar Clerks to assess whether Villanueva had ever performed job duties other than those of Salad Bar Clerk. Statter did not speak with Plaintiffs, who observed Villanueva performing Produce Clerk duties on several occasions.

---

[3]Plaintiffs raise hearsay objections to this and other similar facts relating to what Statter was told by various Dominick's employees during his investigation of Plaintiffs' allegations. The statements have relevance independent of the truth of the matter asserted therein because they bear directly on Statter's state of mind, which is an important factor in assessing the reasonableness of his investigation. As such, these facts are not hearsay, see Fed. R. Evid. 801, and thus the fact that the statements were made to Statter during the course of his investigation, not the matter asserted, are deemed admitted.

Statter concluded that Villanueva's reclassification as Produce Clerk had been a clerical error. The primary basis for Statter's conclusion that it was a clerical error was the assumption that if Dominick's had intended to promote Villanueva to Produce Clerk, she would have been performing those duties.

### C. Carol Eppenstein

In January 2001, Carol Eppenstein ("Eppenstein"), a Caucasian female, who was employed at Dominick's Store 1147 as a Bulk Clerk, was formally reclassified as a Produce Clerk. Between January 2001 and June 2002, however, Eppenstein continued to be listed on the weekly work schedules as a Bulk Clerk, which is part of the same seniority group as Salad Bar Clerks, and thus, one seniority group below Produce Clerk. During this 18-month period, Eppenstein occasionally performed Produce Clerk duties. Plaintiffs did not file a grievance regarding the inaccurate classification of Eppenstein's job title on the weekly work schedule.

### D. Ezequiel Rodriguez

Ezequiel Rodriguez ("Rodriguez"), a Hispanic male, worked with Plaintiffs as a part-time Produce Clerk. Rodriguez's applicable seniority date was September 12, 1994, and as a consequence, he had less seniority than Plaintiffs Hamb, Smith and Thomas. Nevertheless, at various times, Dominick's listed Rodriguez on the weekly work schedule as having more seniority than Plaintiffs Thomas and Smith, though it always reflected that he had less seniority than Hamb. As a result of the incorrect placement of Rodriguez on the weekly work schedules, Thomas and Smith were prevented from claiming Rodriguez's hours and Rodriguez was allowed to claim theirs. When Thomas and Smith learned in 2004 that they had more seniority than Rodriguez, Thomas contacted Statter and filed another grievance.

Statter investigated Thomas's grievance and determined that it was well-founded, as there had been a violation of the CBA. As a consequence, Statter recommended that Thomas be compensated.

### E. Resolution of Plaintiffs' Grievances

Plaintiffs' grievances regarding Villanueva and Rodriguez (as well as certain additional unrelated grievances) were resolved between Dominick's and the Union in April 2006 through the CBA's grievance procedure. Dominick's agreed to pay over fourteen thousand dollars for the Union to divide among Plaintiffs. According to the Union's letter to Plaintiffs announcing the settlement, the settlement amount was based on the number of actual hours owed, as well as "the Union's good faith calculation of the number of hours [Plaintiffs] might have claimed from Kathy Villanueva given [their] seniority, availability and other factors." The Union's letter further advised Plaintiffs that the settlement agreement "does not release any claims contained in your federal lawsuit against Dominick's and Local 881."

## DISCUSSION

### A. Title VII and Section 1981 Claims

This is not a failure to promote case. Rather, in connection with their claims involving Villanueva and Eppenstein, Plaintiffs claim that the Dominick's Defendants discriminated against them on the basis of their race and sex by concealing the job classification and seniority status of Caucasian, female employees in order to prevent Plaintiffs from exercising the privileges of their seniority to claim the hours of the less senior Caucasian, female employees. With respect to their claims involving Rodriguez, Plaintiffs Thomas and Smith allege that the Dominick's Defendants discriminated against them on the basis of their race by placing

8

Rodriguez above them on the weekly work schedule despite the fact that he had less seniority than they did.

Plaintiffs who allege discrimination under Title VII and Section 1981 may establish their claims using either the direct or indirect methods of proof. *Scaife v. Cook County*, 446 F.3d 735, 739 (7th Cir. 2006). In this case, Plaintiffs present no direct evidence of discrimination, such as an outright admission by defendants, nor do they attempt to construct a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision-maker." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). As such, Plaintiffs must proceed by way of the indirect method of proof.

Under the indirect method of proof, Plaintiffs bear the burden of producing evidence to establish a *prima facie* case of discrimination. *Rhodes*, 359 F.3d at 504. To establish a *prima facie* case of race or sex discrimination, Plaintiffs must produce evidence that (1) they belong to a protected class; (2) they performed their job according to their employer's legitimate expectations; (3) they suffered an adverse employment action; and (4) a similarly-situated employee who was not a member of a protected class was treated more favorably. *Id.* If Plaintiffs meet this burden, the Dominick's Defendants must then articulate a legitimate, non-discriminatory reason for its action. If the Dominick's Defendants offer a legitimate, non-discriminatory reason, the burden shifts back to Plaintiffs to present evidence that the Dominick's Defendants' proffered reason is a pretext for discrimination. *Id.* If Plaintiffs produce evidence of pretext, a fact-finder could infer discrimination.

The Dominick's Defendants contend first that Plaintiffs cannot establish a *prima facie* case of discrimination because they cannot show that they suffered an adverse employment

action. The Dominick's Defendants contend that Plaintiffs were reimbursed for any compensation they lost due to the incorrect listing or classification of Caucasian employees on the weekly Produce Department work schedules through the settlement between the Union and Dominick's of the grievances filed on their behalf. In effect, the Dominick's Defendants argue that Plaintiffs have elected their remedy and forfeited their right to a judicial determination of their charge of discrimination by accepting the benefits of the settlement agreement.

It is well-settled that an employee does not waive his right to litigate a claim under Title VII in federal court if "he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974). In *Alexander*, the Supreme Court recognized, though, that "presumably an employee may waive his cause of action under Title VII as a part of a voluntary settlement." 415 U.S. at 49, n. 15. Nevertheless, footnote 15 observed that Alexander did not enter into a voluntary settlement "expressly conditioned" on waiver of his cause of action under Title VII and stated, "In determining the effectiveness of any such waiver, a court would have to determine at the outset that the employee's consent to the settlement was voluntary and knowing." 415 U.S. at 52. The Sixth Circuit has construed this observation to mean that a plaintiff must explicitly waive his right to pursue his claims in federal court. *See Lyght v. Ford Motor Co.*, 643 F.2d 435, 441-42 (6th Cir. 1981) (finding no waiver unless plaintiff or his attorney negotiated the settlement and it was formalized by a consent decree, written release or signed settlement agreement, specifically waiving the right to future litigation).

"[F]actors which courts have considered in deciding whether a waiver is valid include whether the release specifically states that the party was waiving his right to sue; whether the

releasing party was represented by an attorney during negotiations; whether the releasing party was given a clear explanation of Title VII rights before signing the release; whether there was evidence of real negotiations; whether the party knew or should have known about their rights considering their profession or past experience; and the amount of consideration received in return for the waiver." *See Smith* v. *Orrington Hotel*, 1986 WL 8360, * 2 (N.D. Ill. July 22, 1986) (citations omitted).

In this case, Plaintiffs' acceptance of the benefits of the settlement negotiated by the Union does not foreclose the present lawsuit. The Union expressly advised Plaintiffs that they were not releasing any of their claims as part of the settlement. Since there is no reason to believe that Plaintiffs did not rely on that representation when accepting the benefits of the settlement, nor that their reliance was unreasonable, Plaintiffs did not knowingly and voluntarily waive their right to proceed under Title VII. *See Lyght*, 643 F.2d at 441-42 (finding that plaintiff had not waived his right to proceed under Title VII where he was not told that his settlement would result in a waiver of his federal court causes of action).

It would also be inappropriate to dismiss Plaintiffs' suit on this ground because the settlement does not give Plaintiffs everything sought by their complaint. In *Strozier* v. *General Motors*, 442 F. Supp. 475 (N.D. Ga. 1977), the court found that as a result of the settlement of the grievances filed by an employee in connection with disciplinary actions that were the basis of his Title VII action, he was reinstated and received back pay. Since the settlement relief was "substantially equivalent to that obtainable under Title VII ...," 442 F. Supp. at 481, the court found his Title VII action was foreclosed. In this case, in contrast, Plaintiffs seek front pay and

11

punitive damages in addition to back pay and compensatory damages. As a consequence, the settlement does not constitute a "make whole" remedy.

The Dominick's Defendants next contend that Plaintiffs cannot establish a *prima facie* case of discrimination because they cannot show an adverse employment action since they fail to quantify the financial loss they suffered as a result of their inability to claim the hours of less senior, Caucasian employees. The court agrees that Plaintiffs have not demonstrated with particularity the size of their loss, but the settlement agreement, which was based on the Union's calculation of the number of hours Plaintiffs might have claimed from Villanueva and sets the loss figure at in excess of $14,000, indicates that the lost compensation in this case is significant enough to constitute an adverse employment action. The cases cited by the Dominick's Defendants, *Market v. Illinois Bell Tel. Co.*, 2003 WL 22697284 (N.D. Ill. Nov. 13, 2003) and *Utomi v. Cook County*, 2001 WL 914465 (N.D. Ill. Aug. 14, 2001), are therefore distinguishable, as the problem in those cases was that the plaintiffs failure to calculate their losses "with any degree of specificity" gave the courts no basis to assess whether the alleged losses were more than *de minimis* and thus whether the adverse employment action was material.

The Dominick's Defendants' contention that Plaintiffs' *prima facie* case of discrimination fails because they cannot show that they are similarly situated to Villanueva is frivolous. What is at issue in this case is whether the Dominick's Defendants applied the bargained-for seniority rules equally to African-American and non-African-American employees. As such, since all of the Dominick's Store 1147 employees were subject to the terms and conditions of the CBA, Plaintiffs are similarly situated to all of their colleagues. Regardless, even if the relevant class is narrowed to Produce Department employees, or Produce Clerks for

that matter, it is undisputed that Villanueva was classified during the relevant time period as a Produce Clerk, and thus she was similarly situated to Plaintiffs. While the Dominick's Defendants maintain that Villanueva's Produce Clerk classification was a mistake, that does not alter the fact that for the period in question she was subject to the rules applicable to her official seniority group.

Moreover, there is an issue of fact as to whether the Dominick's Defendants' assertion that Villanueva's classification as a Produce Clerk was a mere "clerical error" is a pretext for intentional discrimination. Robert Smith's preparation of the paperwork necessary to effect Villanueva's reclassification as a Produce Clerk even though a vacancy for that job had never been posted as required by the CBA suggests an intent to afford her preferential treatment. The fact that each of the Plaintiffs observed Villanueva on occasion performing Produce Clerk duties suggests that Villanueva's practice of performing the duties of both jobs was sufficiently common that the Dominick's Defendants would have been aware of it, which itself permits an inference that they allowed it. Since it is a violation of the CBA for Salad Bar Clerks to perform the duties of Produce Clerks, the fact that the Dominick's Defendants permitted Villanueva to perform Produce Clerk duties gives rise to an inference that they knew she was classified as a Produce Clerk. On that same point, the mere fact that Villanueva was classified for nearly two full years as a Produce Clerk casts doubt on the Dominick's Defendants' "mistake" justification for the differential treatment. Villanueva was working full-time throughout 2001 and 2002 (anywhere from 40 to 48 hours per week). As a result of her reclassification to Produce Clerk, she received a $2.50 per hour pay raise. Thus, Villanueva's reclassification cost the Produce Department approximately $100 per week, or $400 per month. That, of course, is not an

outrageous sum, but a fair argument can be made that it would have been sufficient to come to the attention of a department manager on a tight budget at a struggling store.

The Dominick's Defendants rely on the same unsubstantiated "mistake" justification to explain Eppenstein's classification on the weekly work schedule as Bulk Clerk despite her official classification as Produce Clerk. Here again, the fact that the alleged "mistake" persisted for a substantial period of time, in this instance 18-months, suggests intentional, not careless or negligent conduct. In fact, if Bulk Clerks were phased out in January 2001 as the Dominick's Defendants state, then it is particularly implausible that Robert Smith would continue by mere accident or inattention to list Eppenstein as a Bulk Clerk for the next 75 or so weeks. Finally, the Dominick's Defendants' justification is further undermined by the failure to provide any explanation for how Robert Smith came to recognize his alleged "mistake."

In light of the foregoing, the Dominick's Defendants' motion for summary judgment on Plaintiffs' race and sex discrimination claims with respect to Villanueva and Eppenstein is denied.

The Dominick's Defendants "mistake" justification fares no better with respect to the improper listing of Rodriguez on the weekly work schedules. Rodriguez was incorrectly listed ahead of Thomas for five years. It seems implausible that at no time during that five years would Robert Smith have undertaken a fresh review of the Produce Clerks seniority dates and uncovered his alleged "mistake", or for that matter, come upon it by happenstance. Nevertheless, there is no basis to conclude that the preferential treatment apparently afforded Rodriguez is attributable to his race. During the time Rodriguez was listed ahead of Thomas and Smith, at least three other Hispanic males were employed in the Produce Department. Since there is no

14

evidence that any of them were afforded preferential treatment, Rodriguez's inflated seniority status can only be attributed to a non-prohibited characteristic. Accordingly, defendants' motions for summary judgment as to the claims involving Rodriguez are granted.

## B. LMRA Claims

Section 301 of the LMRA permits an employee to file suit in the district court for violation of a collective bargaining agreement between the employee's union and the employer.[4] To maintain an actionable § 301 claim against the employer, however, "[a]n employee must establish that the union breached its duty of fair representation." *Filippo v. Northern Ind. Pub. Serv. Corp. Inc.*, 141 F.3d 744, 748 (7th Cir.1998); *see also McKelvin v. E.J. Brach Corp.*, 124 F.3d 864, 869 (7th Cir.1997). A union breaches its duty of fair representation when its actions are arbitrary, discriminatory, or in bad faith. *See Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S. Ct. 1127, 1129-30, 113 L. Ed. 2d 51 (1991); *Vaca*, 386 U.S. at 190.

"The doctrine of fair representation is an important check on the arbitrary exercise of union power, but it is a purposefully limited check...." *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 374, 110 S. Ct. 1904, 109 L. Ed. 2d 362 (1990). "[T]he test for determining whether particular conduct is arbitrary can be quite forgiving." *Garcia*, 58 F.3d at 1176. "[A]

---

[4] Defendants argue that they are entitled to summary judgment on Plaintiffs' LMRA claims because Plaintiffs failed to exhaust the grievance procedures of the CBA. Ordinarily, to bring an action under section 301(a) an individual employee must indeed exhaust the grievance provisions of his collective bargaining agreement. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S. Ct. 614, 13 L. Ed. 2d 580 (1965). The Supreme Court, however, held in *Vaca v. Sipes*, 386 U.S. 171, 186, 87 S. Ct. 903, 914, 17 L. Ed. 2d 842 (1967), that "[A] wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance." Thus, the issue remains whether Plaintiffs can establish that the Union breached its duty of fair representation.

union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness, 'as to be irrational.'" *Porca*, 38 F.3d at 295 (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S. Ct. 1127, 113 L. Ed. 2d 51 (1991)); *see Marquez*, 525 U.S. at 45; *Ooley v. Schwitzer Div. Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir.1992). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez*, 525 U.S. at 45-46. A course of action may be considered irrational only when it is "without a rational basis or explanation." *Id.* at 46. "The union must provide 'some minimal investigation of employee grievances,' but the thoroughness of this investigation depends on the particular case, and 'only an egregious disregard for union members' rights constitutes a breach of the union's duty.'" *Garcia*, 58 F.3d at 1176 (quoting *Castelli v. Douglas Aircraft Co.*, 752 F.2d 1480, 1483 (9th Cir.1985)).

"The plaintiff must also establish both that the union acted at least arbitrarily and that the plaintiff was actually harmed by the union's actions." *Garcia*, 58 F.3d at 1176 (citing *Black v. Ryder*, 15 F.3d 573, 585 (6th Cir.1994); *Ooley*, 961 F.2d at 1303-04). Plaintiffs must therefore establish that the outcome of the grievance procedures would probably have been different but for the union's activities. *Id.*

Plaintiffs argue that the Union handled the investigation of their grievance regarding Villanueva in a perfunctory manner because Statter failed to 1) file a grievance until almost a month after Thomas first raised the allegations regarding Villanueva; 2) enforce the CBA's requirement that an employer submit a written response to a grievance within 15 days;

16

3) accurately characterize Thomas's allegations in the grievance; 4) interview them or other African-American employees; and 5) investigate how Villanueva was promoted.

Statter's failure to file a grievance within the CBA's fifteen-day time limit or to enforce the CBA's fifteen day written-response requirement is not evidence of a perfunctory investigation. Upon learning of the allegations, Statter immediately contacted Selby and received assurances that Villanueva's classification would be changed back to Salad Bar Clerk, her pay reduced, and an updated seniority list posted in the store. Based on Selby's representations, Statter could have reasonably concluded that Plaintiffs were no longer being disadvantaged, and thus, that further immediate action was unnecessary. Thus, a two-week delay in the formal commencement of an investigation is, under the circumstances, not unreasonable.

There is no suggestion that Statter misapprehended Thomas's allegations, so it is hard to see the significance of Statter's inartful formulation of the allegations on the grievance form, particularly since Plaintiffs identify no harm they suffered as a result. Likewise, Statter's failure to take the additional investigatory step of speaking with Plaintiffs is, on the whole, of little significance. Statter spoke with Salad Bar personnel and they advised him that Villanueva performed only Salad Bar Clerk duties. Since those employees were perhaps in the best position to observe Villanueva, their observations were entitled to considerable weight on the issue. As consequence, neither of these alleged inadequacies of Statter's investigation rise to the level of arbitrariness.

Regardless, even if Statter had further investigated the matter, Plaintiffs cannot show that Statter probably would have reached a different conclusion. Even if Statter had spoken to Plaintiffs and learned that on occasion Villanueva performed the duties of Produce Clerk, he

17

could have reasonably concluded that the practice was not so common that the Dominick's Defendants would have been aware of it. While Thomas testifies that he observed Villanueva perform the duties of Produce Clerk "less than 50 times", other Plaintiffs recall only a couple of occasions, and others just one. Regardless, even if he had believed that the Dominick's Defendants knew that Villanueva performed duties of both Produce Clerk and Salad Bar Clerk, he still could have reasonably concluded that the Dominick's Defendants did not know that Villanueva had been reclassified as a Produce Clerk. Since even the wildest estimates had Villanueva performing Produce Clerk duties on a very limited scale, Statter could have believed that the Dominick's Defendants were simply having Villanueva perform Produce Clerk duties when work in the Produce Department was heavy or when work in the Salad Bar was light. That, of course, would still have been a CBA violation, as Salad Bar Clerks cannot perform the duties of Produce Clerks, but it is not the violation that Thomas grieved, and therefore Statter's failure to pursue it is not evidence of arbitrariness.

Nonetheless, Statter's failure to investigate whether the CBA posting procedures were followed before Robert Smith prepared the paperwork to effect Villanueva's reclassification creates an issue of fact as to whether his investigation and decision were arbitrary. As noted in the discussion of Plaintiffs' Title VII and Section 1981 claims, Smith's efforts to promote Villanueva without first posting the position suggests an intent to afford her preferential treatment. Absent evidence that the posting procedures were ignored as a matter of routine, that they had been disregarded in the context of a promotion of a non-Caucasian employee, or that they were disregarded in this instance for a reason unrelated to race or sex, Smith's failure to adhere to the CBA's proper posting procedures in the promotion of Villanueva and Eppenstein

18

suggests that the preferential treatment they received was quite possibly motivated by impermissible considerations of race or sex. Thus, a reasonable juror could point to Statter's failure to investigate this issue and factor in Smith's failure to post the Produce Clerk position to support a finding that the Union acted arbitrarily in its investigation and resolution of Plaintiffs' grievance, and that the size and timing of the Plaintiffs' settlement of their grievances would have been different had the Union fairly represented them. Accordingly, defendants' motion for summary judgment is denied as to Plaintiffs' claim regarding Villanueva.

Plaintiffs did not ask that a grievance be filed in connection with Eppenstein's promotion to Produce Clerk. As a consequence, Plaintiffs cannot show that the Union breached a duty of fair representation with respect to Eppenstein's classification on the weekly work schedule. Statter's failure to investigate issues surrounding Eppenstein's promotion and classification, however, are relevant to the claim relating to Villanueva, as both promotions took effect on the same date and involve similar circumstances. Thus, Statter's investigation, or lack thereof, of Eppenstein's promotion is highly probative on the reasonableness of its investigation and resolution of Plaintiffs' grievance regarding Villanueva.

Plaintiffs present no evidence to suggest that the Union breached its duty of fair representation with respect to Rodriguez's placement above Thomas and Smith on the weekly work schedule. The evidence shows that Plaintiffs and Dominick's attempted to settle the grievance shortly after it was filed, and that those negotiations continued on until April 2006 when Thomas and Smith agreed to settle the grievances in exchange for $4,945.58 each.

Since there is an issue of fact as to whether the Union breached its duty of fair representation to Plaintiffs with respect to the grievance filed regarding Villanueva, the Union

Defendants' motion for summary judgment on Plaintiffs' LMRA claim is denied. For the same reason, Plaintiffs can maintain an action against the Dominick's Defendants for breach of the collective bargaining agreement, and thus, the Dominick's Defendants' motion for summary judgment on Plaintiffs' LMRA is also denied.

## ORDER

For the reasons stated above, the Union Defendants' motion for summary judgment [#116] and the Dominick's Defendants' motion for summary judgment [#118] are denied in part and granted in part. This matter will be called for a status hearing on April 26, 2007 at 9:30 a.m. In the meantime, the parties are directed to confer about the possibility of settlement.

Date: March 29, 2007

Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge